## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

LAUREN MCFALLS, individually, and on behalf of all others similarly situated and the Proposed Rule 23 Class,

     *Plaintiff,*

     *v.*

NCH HEALTHCARE SYSTEM, INC., and NAPLES COMMUNITY HOSPITAL, INC.,

     *Defendants.*

Civ. Action No.: 2:23-cv-572

**CLASS AND COLLECTIVE ACTION COMPLAINT**

Demand for a Jury Trial

Plaintiff Lauren McFalls, individually and on behalf of all others similarly situated and the proposed Rule 23 Class, by her undersigned attorneys Varnell & Warwick, P.A., Towards Justice, and Nichols Kaster, PLLP, for her Complaint, alleges as follows:

### INTRODUCTION

1. Defendants NCH Healthcare System, Inc. ("NCH Healthcare") and Naples Community Hospital, Inc. ("Naples Community") (collectively, "NCH" or "Defendants") are a hospital system with "dozens of locations throughout Collier County and Southwest Florida."[1]

---

[1] *See* NCH Healthcare System, "About Us", www.nchmd.org/about-us/ (accessed July 6, 2023).

2.      Each year, Defendants hire hundreds of new nurses and recruit many of these nurses into "Specialty Fellowship Programs."

3.      Defendants advertise the purported fellowship as an opportunity to become ingrained in a new specialty practice area for nurses with paid training.

4.      The reality is far different. Defendants use the purported fellowship to lock in nurses to two-year contracts with the threat of thousands of dollars in debt should a nurse choose to leave Defendants' hospitals prior to conclusion of the two years.

5.      Defendants require all nurses in the purported fellowship to sign a training repayment agreement provision ("TRAP") that charges nurses a $5,000 "program fee" if they dare to leave Defendants' hospital before working for two years. The $5,000 "debt" is only forgiven if the nurse remains employed with Defendants for at least two years.

6.      Despite its academic-sounding name, the purported fellowship does not provide nurses with a recognized degree or credential.

7.      The fellowship purportedly provides unique and significant training to newer nurses by pairing them with a supervising nurse during their work shifts and offering a classroom course one day each week.

8.      Pairing newer nurses with a supervising nurse during the first few months of employment is not unique to Defendants' hospitals.

9.      Rather, it is typical for hospitals to pair newer nurses with a supervising nurse, known as a preceptor, for the first few months to orient the

newer nurse to the hospital's procedures and practices without requiring participation in a purported fellowship.

10.    The classroom course also does not offer unique or specialized training to newer nurses.

11.    The classroom course includes a morning session with lectures by one of Defendants' "educational directors" on general and introductory topics, such as how to turn on a fire hydrant and basic information about which machines are used in the hospital, and an afternoon session where the nurses read online modules from Elsevier, an academic publisher.

12.    The training that Defendants provide is primarily for their benefit, not for nurses' benefit.

13.    The fellowship is designed to impose the $5,000 TRAP fee to prevent newer nurses from leaving Defendants' hospitals before their multi-year contracts are up.

14.    The $5,000 fee is well beyond what nurses are able to afford, as it was almost ten percent of Ms. McFalls' annual salary. As a result, the TRAP strips nurses of bargaining power that they could use to seek out employment opportunities in which they could be treated fairly.

15.    Defendants use the TRAP to prohibit nurses from leaving regardless of the circumstance. Despite grueling work conditions, including understaffing and missing mandatory breaks and lunch, Defendants requires nurses to pay

thousands of dollars if they leave. Defendants follow through on their threats by sending collection agencies after nurses who dare to leave.

16.    It is a bedrock principle of the American labor market that employers are responsible for the costs of doing business. Employees are paid for their time and their work. In exchange, employers receive the benefit of employees' labor. Employees are not supposed to be charged for the opportunity to do their jobs.

17.    But Defendants seek to upend this fundamental tenet by requiring many new nurses to sign the TRAP.

18.    Defendants tell nurses that these charges are necessary to reimburse Defendants for the training provided to nurses.

19.    But this training is not for the nurses' benefit. Rather, it is for Defendants' benefit. Defendants receive the benefit of the labor of skilled and capable nurses and the training enables the nurses to be more effective employees.

20.    The effect of the TRAP is to penalize nurses and keep them stuck in their jobs despite poor working conditions. This violates state and federal law, undermines nurses' bargaining power, and deprives other healthcare providers of qualified nurses at a time when competent and qualified nurses are sorely needed across Florida and the United States.

21.    This lawsuit seeks to end Defendants' illegal practices and to compensate victims.

22.     Ms. McFalls, individually and on behalf of all others similarly situated, seeks to hold Defendants accountable for their conduct and seeks all available damages, remedies, and penalties under the Fair Labor Standards Act, 29 U.S.C. § 216; Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.204; Florida Antitrust Act, Fla. Stat. § 542.18; and the Florida Declaratory Judgment Statute, Fla. Stat. § 86.011.

## THE PARTIES

23.     NCH Healthcare System, Inc. is a Florida Not For Profit Corporation with its principal address located at 350 7th Street North, Naples, FL 34102.

24.     Naples Community Hospital, Inc. is a Florida Not For Profit Corporation with its principal address located at 350 7th Street North, Naples, FL 34102.

25.     Plaintiff Lauren McFalls was employed by Defendants as a nurse from approximately May 2021 to April 2022 and resided in Florida during this time.

26.     Defendant NCH Healthcare was the counterparty to Ms. McFalls' employment agreement and fellowship agreement.

27.     At all times relevant to this action, Ms. McFalls worked in the Emergency Room Department at Baker Downtown Hospital, which was operated by NCH Healthcare.

28.     Ms. McFalls' paystubs were disbursed by Naples Community.

29.     At all times relevant to this action, NCH Healthcare and Naples Community have operated as a "single employer," "single integrated enterprise,"

and/or "joint employer" of Plaintiff and other members of the Class and Collective, as defined in caselaw and regulations interpreting the Fair Labor Standards Act ("FLSA").

30.     NCH Healthcare and Naples Community, among other things, share a main office address, common control, common employees, and the same healthcare facilities.

31.     NCH Healthcare and Naples Community are so closely related that they are essentially a single employer, single integrated enterprise, and/or joint employer.

32.     Together, they employed Plaintiff and other nurses who participate in the purported fellowship and they continue to jointly employ such nurses today.

33.     NCH Healthcare and Naples Community have similar and overlapping management and staff.

34.     For example, Paul Hiltz serves as CEO of NCH Healthcare and Naples Community.

35.     Jonathan Kling serves as COO of NCH Healthcare and Naples Community.

36.     Matthew Heinle serves as General Counsel of NCH Healthcare and Naples Community.

37.     At all times relevant to this action, Defendants were an enterprise engaged in interstate commerce within the meaning of the FLSA, 29 U.S.C. § 203(r)-(s).

38.    Defendants had gross sales made or business done in excess of $500,000 annually for each of the years from 2019 through 2023.

39.    Throughout Ms. McFalls' employment, each Defendant was an "employer" of Plaintiff as defined by the FLSA.

40.    Throughout her employment, Plaintiff was a non-exempt "employee" of Defendants as defined by the FLSA.

41.    Throughout her employment, Defendants "employed" Plaintiff within the meaning of the FLSA.

## JURISDICTION AND VENUE

42.    This Court has subject matter jurisdiction over Ms. McFalls's federal claims pursuant to 28 U.S.C. § 1331 (federal question) because Defendants' conduct violates the FLSA, 29 U.S.C. § 216(b).

43.    This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because Plaintiff's state law claims are so closely related to her FLSA claim that they form part of the same case or controversy under Article III of the United States Constitution.

44.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because Defendants reside in this District in Collier County. Venue is also proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL BACKGROUND

## I.    THE SPECIALTY FELLOWSHIP PROGRAM

45.    According to Defendants' website, "Specialty fellowships are designed to help transition nurses from medical/surgical practice to a specialty practice area. The curriculum is a blended learning model comprised of on-line learning, classroom didactic, skills validation and clinical practice with an experienced preceptor. Fellowships are 16-20 weeks in length."[2]

46.    In 2019 alone, 49 of the 331 nurses that Defendants hired participated in the purported fellowship.[3]

47.    The nurses who participate in the purported fellowship are typically, if not all, newer and more junior nurses.

48.    Defendants do not hire newer nurses if they are unwilling to participate in the purported fellowship.

49.    The fellowship includes two components: (1) working under the supervision of a preceptor during a nurse's shifts; and (2) classroom courses for one day each week.

50.    During the length of the fellowship, a nurse works with a preceptor, another nurse with more experience in the same department.

---

[2] *See* NCH Healthcare System, www.nchmd.org/about-us/professional-nursing/ (accessed July 6, 2023).

[3] *See* NCH Healthcare System, 2019 Nursing Annual Report, www.nchmd.org/about-us/professional-nursing/ (accessed July 7, 2023).

51.    In most hospitals, it is typical for less experienced nurses to be assigned to a preceptor for the first few months to introduce the new nurse to the hospital's practices.

52.    Most hospitals do not require less experienced nurses to participate in a "fellowship" in order to work under the supervision of a preceptor, much less incur debt to do so.

53.    The classroom course typically lasted between six (6) and eight (8) hours a day once a week.

54.    In the morning of the classroom course, an educational director at Defendants' hospitals lectures to the nurses for several hours about introductory topics for working at the hospital.

55.    The educational director typically provides the same training to nurses who will be working on different floors and different departments of Defendants' hospitals.

56.    In the afternoon of the classroom course, the nurses independently read online modules from Elsevier, an academic publisher.

57.    The nurses who participate in the fellowship do not receive any credential, certification, or license for the "training" that they receive.

58.    In order to participate in the purported fellowship, each nurse is required to sign an agreement with the following terms:

- I understand and agree that in consideration of the training I will receive, I will be required to maintain regular full time status in good standing within the [Assigned Unit] for a period of two (2) years

following my start date in the Fellowship Program unless catastrophic circumstances prevent this as approved by the CNO or Chief of Human Resources.

- In the event I do not fulfill my obligation under the Fellowship Program, thru no fault of NCH, I will be responsible to pay back the program fee of $5,000. This fee will not be prorated based on time in the program. In the event of catastrophic circumstances which may prevent fulfillment of the agreement payback options will be reviewed and approved only by the CNO or Chief of Human Resources on an individual basis.[4]

59.     The purported fellowship does not indicate how the TRAP fee of $5,000 is determined or whether it is intended to evaluate the reasonable cost of the training.

60.     Indeed, regardless of whether a nurse participates in one day of the purported fellowship, or completes the training and leaves one day prior to the end of the two-year contract, they will be charged $5,000.

61.     The TRAP is an unreasonable restraint of trade. The TRAP imposes a serious financial burden on nurses who wish to leave Defendants' hospitals, whether they are doing so in response to a family emergency, a pandemic, a natural disaster, to work for a competitor, move elsewhere, or change careers. The TRAP is not reasonably tailored to maintaining Defendants' business interests. Rather, it is designed to punish employees for exercising their right to seek better, safer, or different terms of employment elsewhere.

---

[4] Exhibit 1, Specialty Fellowship Program Employment Agreement.

62.    The TRAP is not a reasonable forecast of just compensation for the training provided. The valuation for training is arbitrary and inflated, and fails to consider that Defendants are receiving the benefit of Plaintiff's and other nurses' labor during much of the purported fellowship.

## II.    COLLECTIONS EFFORTS

63.    If a nurse participates in the purported fellowship and leaves their job within two years, Defendants demand payment of the outstanding TRAP amount within weeks of resignation.

64.    Defendants threaten to send the remaining debt to a third-party collections company if the nurse failed to repay the TRAP amount and follow through on their threat by sending the debt to a collections company.

## III.    PLAINTIFF LAUREN MCFALLS

65.    Plaintiff Lauren McFalls is a Registered Nurse with experience working in Emergency Room Departments prior to her employment in Defendants' hospitals.

66.    Ms. McFalls did not apply for a position at Defendants' hospitals in order to participate in the fellowship.

67.    During the interview process and prior to being hired, Ms. McFalls received strong suggestions by employees, including a critical care director and other nurses, of Defendants' hospitals that she should participate in the fellowship.

68.    While the purported fellowship was typically for nurses transitioning into a new specialty area, Ms. McFalls already had experience working in Emergency Room Departments.

69.    Ms. McFalls was offered an ER nurse position at Defendants' hospital over the phone, and was required to accept or decline the position within twenty-four (24) hours.

70.    At the same time she received the job offer, she was required to decide whether to participate in the fellowship within twenty-four (24) hours.

71.    Based on the recommendations of Defendants' employees and the repeated strong suggestion that she participate in the fellowship, Ms. McFalls did not feel like she could say no without looking bad to her new potential employer, and so she participated in the fellowship, thinking that it could make her a better ER nurse. It did not.

72.    When Ms. McFalls was hired, she signed three agreements with Defendants.

73.    The first agreement was an offer of employment stating that she would be hired on a full-time basis as a nurse in the ER to work 72 hours per pay period in return for her hourly wage.

74.    The second agreement was the Specialty Fellowship Program employment agreement, which stated that Ms. McFalls would be employed full time in the ER for two years in exchange for the training program, with a penalty of $5,000 should Ms. McFalls leave prior to two years of employment.

75.     The third agreement was a sign-on bonus agreement, which stated that Ms. McFalls agreed to remain employed by Defendants on a full-time basis as a nurse in the ER for two years in exchange for receiving a $20,000 sign-on bonus. Because Ms. McFalls already agreed to remain employed by Defendants on a full-time basis as a nurse in the ER for two years, Defendants received no consideration for the sign-on bonus agreement. Thus, the sign-on bonus agreement is not a valid contract and unenforceable.

76.     Ms. McFalls began working at Defendants' Baker Downtown Hospital campus in May 2021 as a full-time Nurse for the evening shift in the Emergency Room Department.

77.     Plaintiff Lauren McFalls joined the purported fellowship in May 2021 as a nurse in the Emergency Room Department.

78.     Ms. McFalls worked full-time as an ER nurse while participating in the fellowship.

79.     Again, as part of the purported fellowship, Ms. McFalls was supposed to work under the supervision of a preceptor for all shifts in the ER during the 16-week fellowship.

80.     However, due to routine high patient loads and understaffing, Ms. McFalls sometimes worked without the supervision of a preceptor at her preceptor's direction.

81.     On multiple occasions, Ms. McFalls' colleagues and supervisors told her that she did not need to be working under the supervision of a preceptor and was fully capable of working independently as an ER nurse.

82.     During the classroom course each week, Ms. McFalls' morning session was taught by the Emergency Room Educator.

83.     The Emergency Room Educator also taught classroom courses to nurses in other departments.

84.     The topics covered by the lectures included: (1) how to open a fire hydrant; (2) how to respond to mass casualty events; (3) and introductory information about machines and techniques used in the ER.

85.     In the afternoon of the classroom course, Ms. McFalls independently read online modules from Elsevier, an academic publisher.

86.     The training Ms. McFalls received in the classroom courses did not prepare Ms. McFalls for any specialized aspect of being an ER nurse.

87.     Much of the training in the purported fellowship covered knowledge and techniques that Ms. McFalls was already familiar with from her experience working in ERs because they were typical of onboarding procedures in any hospital.

88.     During July 2021, during a surge in COVID-19 cases, Ms. McFalls' supervisor requested that Ms. McFalls just work on her own in the ER, rather than under the supervision of a preceptor.

89.     Just over a month into her employment, despite not completing the 16-week long purported fellowship, Defendants requested that Ms. McFalls leave the purported fellowship program in order to work more in the ER due to an increase in patients with COVID-19. Ms. McFalls felt that she had no choice but to oblige this request and leave the purported fellowship.

90.     Despite not completing the 16-week training as part of the purported fellowship, Defendants requested that Ms. McFalls exit the purported fellowship and work without supervision in the ER.

91.     Ms. McFalls believed she was strongly suggested to leave the purported fellowship because she was capable of practicing without supervision in the ER.

92.     After she exited the purported fellowship, Ms. McFalls no longer attended the classroom course each week.

93.     Ms. McFalls did not receive a transferable license or certificate as a result of the purported fellowship.

94.     Despite not completing the purported fellowship at Defendants' request, the $5,000 TRAP was not reduced or adjusted.

95.     Ms. McFalls worked in Defendants' ER from May 2021 to April 2022. During that time, the conditions were grueling and unsustainable. There was routine understaffing without ancillary support, and she often did not receive breaks during 12-hour shifts.

96.    Ms. McFalls routinely did not have time for a 30-minute break because she was caring for patients and took a 30-minute break approximately once every other week. However, thirty-minute lunch breaks were automatically deducted from her pay even if she did not take a lunch break.

97.    In April 2022, due to poor staffing and working conditions, a family emergency, and the apartment she rented being sold by her landlord, Ms. McFalls resigned from Defendants' hospital.

98.    Within weeks, Defendants began collecting payment.

99.    On April 29, 2022, Ms. McFalls received her paycheck for her final weeks of work. Defendants deducted $477.90 from her paycheck to offset part of Ms. McFalls' "debt."

100.    On May 13, 2022, Ms. McFalls received a paycheck from Defendants in the amount of $0.00 because Defendants deducted all of Plaintiff's 35 hours of accrued paid time off in the amount of $897.91.

101.    On May 13, 2022, Defendants sent Ms. McFalls a letter demanding that she repay the amount of the training program and the sign on bonus and informing her that the $1,375.81 recovered from her last two paychecks was credited towards the debt.

102.    Defendants required repayment of the outstanding debt within 30 days and threatened to forward the debt to a third-party collection company should Ms. McFalls fail to pay the debt within 30 days.

103.    Because the debt is egregious, unfair, unlawful, and harassing, Ms. McFalls has not paid any of the outstanding debt to Defendants.

104.    In July 2022, Ms. McFalls began receiving letters from Accounts Receivable Management Services, Inc., debt collector, attempting to collect the outstanding debt. She received multiple letters from Accounts Receivable Management Services, Inc., between July 2022 and July 2023 seeking to collect the debt.

## CLASS ACTION ALLEGATIONS

105.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure defined as follows:

> All nurses NCH subjected to its Training Repayment Agreement Provision within the statute of limitations.

106.    Plaintiff reserves the right to amend and refine the class definition above or add classes and/or subclasses as litigation progresses.

107.    Numerosity: The Class is so numerous that joinder of all class members is impracticable. NCH's website states that 49 nurses joined the Specialty Fellowship Program in each of 2017 and 2019. Although the precise number of putative Class members is currently unknown, Plaintiff believes that the Class includes more than forty members. These members can be identified based on Defendants' records, which would include information on employees' placement, length of employment and commitment period, and pay.

108.    Commonality: Common questions of law and fact exist as to all members of all Classes and predominate over any questions solely affecting individual members, including but not limited to:

(a) Whether Defendants' conduct is a deceptive and unfair practice;

(b) Whether Defendants' TRAP is an unlawful contract in restraint of trade;

(c) Whether Defendants' TRAP operates as an invalid penalty; and

(d) The proper measure of damages and/or other forms of relief.

109.    These common questions arise, in part, because of the uniform circumstances under which Plaintiff and the Class worked. These include the form contracts and workplace policies that resulted in a standard environment and set of employer-mandated conditions that employees were forced to abide by under the same threat of serious financial harm and legal action.

110.    Typicality: Plaintiff's claims are typical of the members of the Class because Plaintiff was subject to and harmed by Defendants' uniform TRAP contract and Defendants treated Plaintiff consistently with other class members in accordance with their standard policies and practices.

111.    Adequacy:  Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff is committed to the prosecution of this action and has retained counsel that numerous courts have found sufficiently experienced in class actions to be appointed as class counsel. There are no conflicts between Plaintiff and the Class she seeks to represent.

112.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(2) and (b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants use a uniform contract and uniform policies and practices, resulting in common violations of law. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not likely present any difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all class members' claims in a single forum.

113.     Plaintiff intends to send notice to all members of the Class to the extent required by Fed. R. Civ. P. 23(c)(2). The names and addresses of the class members are available from Defendants' records.

## COLLECTIVE ACTION ALLEGATIONS

114.     Pursuant to the collective action provision of the FLSA, 29 U.S.C. § 216(b), Plaintiff seeks to represent an FLSA Collective consisting of all nurses Defendants subjected to the TRAP and who file a consent form to join this action within the statute of limitations.

115.     The proposed FLSA Collective members are similarly situated in that they have been subject to uniform policies and practices by Defendants that

violated the FLSA, including Defendants' TRAP and post-employment collections conduct.

116.    Plaintiff alleges two counts under the Fair Labor Standards Act's Minimum Wage provision: (1) Illegal kickback of wages that bring the wage paid to Plaintiff and those similarly situated below the minimum wage, because Defendants actually took back wages that they had paid; and (2) Failure to pay the minimum wage free and clear because Defendants demanded at least $5,000 of wages back from Plaintiff and those similarly situated if they were to leave their jobs before two years.

### COUNT I:
### FAIR LABOR STANDARDS ACT
### 29 U.S.C. § 216
### ON BEHALF OF PLAINTIFF AND THE COLLECTIVE
### (Illegal Kickback and Failure to Pay Minimum Wage)

117.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth here.

118.    Defendants were Plaintiff's employer pursuant to the FLSA.

119.    Plaintiff was an employee of Defendants pursuant to the FLSA.

120.    Repayment of alleged training costs under the TRAP that Defendants have imposed on Plaintiff and others similarly situated is an illegal kickback of wages to Defendants, because the training was primarily for Defendants' benefit.

121.    Kicking back these costs to Defendants takes employees' wages below the minimum wage, resulting in a minimum wage violation.

122.   Plaintiff and others similarly situated were not paid at least the minimum wage for all hours worked, because they were required to kick back those wages to Defendants under the TRAP.

123.   Defendants' actions constitute willful violations of the FLSA within the meaning of 29 U.S.C. § 255(a).

124.   Plaintiff and others similarly situated are entitled to recover unpaid minimum wages plus an additional equal amount in liquidated damages and declaratory relief that the purported costs of the debt are not reimbursable pursuant to the FLSA, costs of suit, and reasonable attorneys' fees pursuant to 29 U.S.C. § 216(b).

**COUNT II:**
**FAIR LABOR STANDARDS ACT**
**29 U.S.C. § 216**
**ON BEHALF OF PLAINTIFF AND THE COLLECTIVE**
**(Failure to Pay Minimum Wage Free and Clear)**

125.   Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth here.

126.   Defendants were Plaintiff's employer pursuant to the FLSA.

127.   Plaintiff was an employee of Defendants pursuant to the FLSA.

128.   Defendants violated 29 U.S.C. § 206 by unlawfully requiring Plaintiff and others similarly situated to repay $5,000 of their earned and taxed wages to Defendants once their employment with Defendants ended.

129.   Rather than paying Plaintiff and other similarly situated employees their wages "free and clear," Defendants maintained and enforced a policy under

which the wages paid to employees during every pay period were paid conditionally, subject to the requirement that they did not leave their jobs within two years. If they did leave their jobs, they would have to repay all of the wages earned during the pending pay period, plus thousands of additional dollars.

130.    By requiring Plaintiff and other similarly situated employees to return their wages to Defendants if they left their jobs, Defendants failed to pay wages "finally and unconditionally," as required by the FLSA.

131.    Because Defendants failed to pay wages "finally and unconditionally," Defendants failed to meet the wage requirements of the FLSA, which includes the requirement to pay no less than the federal minimum wage for each hour worked free and clear.

132.    Defendants' actions constitute willful violations of the FLSA within the meaning of 29 U.S.C. § 255(a).

133.    Plaintiff and others similarly situated are entitled to recover all unpaid minimum wages plus an additional equal amount in liquidated damages, costs of suit, and reasonable attorneys' fees pursuant to 29 U.S.C. § 216(b).

## COUNT III:
## FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
## FLA. STAT. § 501.204
## ON BEHALF OF PLAINTIFF AND THE CLASS

134.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth here.

135.    Defendants have engaged in, and continue to engage in, deceptive, unconscionable, and unfair acts in violation of Fla. Stat. § 501.204.

136.    Defendants are engaged in trade or commerce, as defined by Fla. Stat. § 501.203(8), by advertising, soliciting, and providing a service in the form of a training program as part of the purported fellowship.

137.    Defendants engaged in deceptive, unconscionable, and unfair acts by representing to Plaintiff and the Class that they will receive a training program as part of the purported fellowship with a value of $5,000 and actually providing training far less valuable than $5,000.

138.    Defendants engaged in deceptive, unconscionable, and unfair acts by imposing a debt of $5,000 on Plaintiff and the Class for receipt of a training program as part of the purported fellowship with a stated value of $5,000 and actually providing training of no or far less value than $5,000.

139.    Defendants engaged in deceptive, unconscionable, and unfair acts by imposing a debt of $5,000 on Plaintiff and the Class for a training program as part of the purported fellowship and using the debt as an unreasonable restraint and penalty to restrict Plaintiff's and the Class's ability to leave employment with Defendants.

140.    Defendants engaged in deceptive, unconscionable, and unfair acts by using the threat of collecting a debt of $5,000 from Plaintiff and the Class for a training program as part of the purported fellowship that cannot reasonably be

valued at $5,000 to unreasonably restrain Plaintiff's and the Class's ability to seek other employment.

141.    Defendants engaged in deceptive, unconscionable, and unfair acts by attempting to collect a debt of $5,000 from Plaintiff and the Class for a training program as part of the purported fellowship that cannot reasonably be valued at $5,000.

142.    Defendants engaged in deceptive, unconscionable, and unfair acts by attempting to collect a debt of $5,000 from Plaintiff and the Class for a training program as part of the purported fellowship that cannot reasonably be valued at $5,000 to unreasonably restrain Plaintiff's and the Class's ability to seek other employment.

143.    Defendants' acts are willful, unfair, unconscionable, deceptive, and contrary to the public policy of Florida.

144.    Defendants represented that the training program as part of the purported fellowship was reasonably valued at $5,000 and that Plaintiff and the Class were receiving the benefit of a training worth $5,000.

145.    Defendants misrepresented and omitted material facts regarding the true value of the training and the value of the purported fellowship.

146.    Defendants misrepresented and omitted material facts that Plaintiff and the Class would receive a training program as part of the purported fellowship that could reasonably be valued at $5,000.

147.    Defendants' representations that the training program as part of the purported fellowship was reasonably valued at $5,000 would have been material to any prospective employee's decision to participate in the purported fellowship.

148.    Defendants' misrepresentations, omissions, and intentional concealments were designed to deceive employees and prospective employees to participate in the purported fellowship.

149.    By concealing the true value of the training program, Defendants deprived employees from being able to make informed decisions regarding the purported fellowship.

150.    As a direct and proximate result of Defendants' unlawful, deceptive, and unfair acts and practices, Plaintiff and the Class enrolled in the purported fellowship and were indebted to Defendants for $5,000.

151.    By imposing an unreasonable debt of $5,000 on Plaintiff and the Class, deducting monies from Plaintiff's and the Class's final paychecks to pay this debt, and attempting to collect this unreasonable debt through the use of third-party collection agencies, Defendants are liable to Plaintiff and the Class for actual damages, attorneys' fees, and the costs of this suit.

## COUNT IV:
## UNLAWFUL CONTRACT IN RESTRAINT OF TRADE
## FLA. STAT. § 542.18
## On Behalf of Plaintiff and the Class

152.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth here.

153.    Fla. Stat. § 542.18 states that "[e]very contract, combination, or conspiracy in restraint of trade or commerce in this state is unlawful."

154.    The clear purpose and effect of the TRAP is to limit nurse mobility and thereby restrain trade. It explicitly punishes nurses who attempt to work somewhere other than Defendants' hospitals with a severe economic penalty.

155.    Contracts in restraint of trade of commerce are void and unenforceable, unless they are reasonable in time, area, and line of business, and support one of the following "legitimate business interest[s]":

- Trade secrets;

- Valuable confidential business or professional information that otherwise does not qualify as trade secrets;

- Substantial relationships with specific prospective or existing customers, patients, or clients;

- Customer, patient, or client goodwill; or

- Extraordinary or specialized training.

Fla. Stat. § 542.335.

156.    Defendant's TRAP is not reasonable in time, area, and line of business. It restricts workers' ability to compete regardless of whether or not they leave Defendants to go work for a competitor.

157.    Defendants' TRAP does not support a legitimate business interest.

158.    Defendants' purported fellowship does not provide extraordinary or specializing training to participating nurses.

26

159.    The purported fellowship provides standard training for nurses entering into new departments that would be offered and made available at competitors' hospitals.

160.    The TRAP imposes a severe economic penalty on departing employees that does not protect any legitimate competitive interest of Defendants. It injures nurses by subjecting them to substantial debts and injures the public by limiting the choice and mobility of skilled nurses.

161.    Defendants' TRAP does not fall within the "legitimate business exception" of Fla. Stat. § 542.335. It is a blatant restraint of trade, not subject to any statutory exceptions, and it is therefore unlawful under Fla. Stat. § 542.18.

162.    Plaintiff and the Class seek a declaration under Fla. Stat. § 542.18 that the TRAP is an unlawful restraint under Florida law.

163.    Plaintiff and the Class seek an injunction under Fla. Stat. § 542.23: (a) prohibiting Defendants from taking any further actions to collect on or enforce its TRAP; (b) prohibiting Defendants from referring any further cases to a collections agency; (c) prohibiting Defendants from reporting this invalid debt to any collections agencies; and (d) requiring Defendants to take appropriate steps to repair the damage done to the credit ratings of the Class members, such as a goodwill deletion agreement.

164.    In addition, Plaintiff and the Class seek to recover threefold actual damages sustained (including, but not limited to, the monies that they have paid to Defendants, or to any collections agency on Defendants' behalf, under the

TRAP), interest on actual damages for the period beginning on the date of service of this Complaint and ending on the date of judgment, the cost of suit, and reasonable attorney's fees.

## COUNT V:
## FLORIDA DECLARATORY JUDGMENT STATUTE
## FLA. STAT. § 86.011
## ON BEHALF OF PLAINTIFF AND THE CLASS

165.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth here.

166.    Liquidated damages clauses for breach of contract are only legal under Florida law where damages are not readily ascertainable at the time of contract formation and where the liquidated damages are not unconscionable in light of the circumstances. Liquidated damages clauses that do not meet both of these requirements are considered to be unenforceable penalties.

167.    The TRAP is an unenforceable penalty. Any harm caused by nurses who leave Defendants before the end of the two-year TRAP term is not incapable of or difficult of estimation, and the amount of liquidated damages Defendants charge departing nurses is not a reasonable estimation of the training costs.

168.    Plaintiff and the Class have been harmed by this unlawful penalty, as set forth above. They seek a declaration under the Florida Declaratory Judgment Statute, Fla. Stat. § 86.011, that the TRAP is unlawful and unenforceable against them, as well as (1) costs; (2) an award equal to actual damages sustained (including but not limited to the monies that the Class have paid to Defendants,

or to any collections agency on Defendants' behalf, under the TRAP); (3) injunctive relief; and (4) any other relief that the Court deems necessary or proper.

## Demand for Jury Trial

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff, on behalf of herself and the Class, demands a trial by jury as to all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class, prays for relief as follows:

(a)     designation of this action as a collective action and issuance of notice pursuant to 29 U.S.C. § 216(b) to all similarly situated employees, apprising them of the pendency of this action, and permitting them to assert timely FLSA claims in this action by filing individual Consent to Join forms pursuant to 29 U.S.C. § 216(b);

(b)     determining that this action may proceed as a class action under Fed. R. Civ. P. 23(b)(2) and (b)(3);

(c)     designating Plaintiff as representative for the Class and designating Plaintiff's counsel as counsel for the Class;

(d)     issuing proper notice to the Class at Defendants' expense;

(e)     declaring that Defendants committed violations of the FLSA, FDUPTA, Florida Antitrust Act, and that the $5,000 liquidated damages provision is an unlawful restraint of trade and unenforceable penalty;

(f)     awarding damages as provided by the FLSA, FDUPTA, Florida Antitrust Act, and Florida Declaratory Judgment Statute, including punitive damages;

(g)     awarding reasonable attorneys' fees and costs as provided by law;

(h)     granting leave to amend to add claims under the Florida Minimum Wage Act; and

(i)     granting further relief, in law or equity, as this Court may deem appropriate and just, including all relief authorized by the FLSA, FDUPTA, Florida Antitrust Act, and Florida Declaratory Judgment Statute.

DATED:     July 31, 2023

**VARNELL & WARWICK, P.A.**

*/s/ Janet R. Varnell*
Janet R. Varnell; FBN: 0071072
Brian W. Warwick; FBN: 0605573
Pamela G. Levinson; FBN: 0538345
Jeffrey Newsome; FBN: 1018667
400 N Ashley Drive, Suite 1900
Tampa, FL 33602
(352) 753-8600
jvarnell@vandwlaw.com
bwarwick@vandwlaw.com
plevinson@vandwlaw.com
jnewsome@vandwlaw.com
ckoerner@vandwlaw.com

**TOWARDS JUSTICE**

Juno Turner (*pro hac vice* motion forthcoming)
David H. Seligman (*pro hac vice* motion forthcoming)

Valerie Collins (*pro hac vice* motion
forthcoming)
Towards Justice
P.O. Box 371689, PMB 44465
Denver, CO 80237-5680
(720) 441-2236
juno@towardsjustice.org
david@towardsjustice.org
valerie@towardsjustice.org

**NICHOLS KASTER, PLLP**

Anna P. Prakash, MN Bar No.
0351362 (*pro hac vice* motion
forthcoming)
Joshua R. Cottle, NY Bar No.
5914676 (*pro hac vice* motion
forthcoming)
4700 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Facsimile: (612) 215-6870
aprakash@nka.com
jcottle@nka.com

Matthew C. Helland, CA Bar No.
250451 (*pro hac vice* motion
forthcoming)
235 Montgomery St., Suite 810
San Francisco, CA 94104
Telephone: (415) 277-7235
Facsimile: (415) 277-7238
helland@nka.com

*Attorneys for Plaintiff*