UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

LAUREN MCFALLS, individually
and on behalf of all others similarly
situated and the Proposed Rule 23
Class,

        Plaintiff,

v.                                                    Case No.:  2:23-cv-572-SPC-KRH

NCH HEALTHCARE SYSTEM,
INC., and NAPLES COMMUNITY
HOSPITAL, INC.,

        Defendants.

_____

## **OPINION AND ORDER**

Before the Court are: (1) Plaintiff Lauren McFalls' Motion for Summary Judgment (Doc. 146), Defendants NCH Healthcare System, Inc. and Naples Community Hospital, Inc.'s ("Defendants" or "NCH") response (Doc. 152), and Plaintiff's reply (Doc. 159); (2) Defendants' Motion for Summary Judgment (Doc. 164), Plaintiff's response (Doc. 167), and Defendants' reply (Doc. 169); and (3) Defendants' Motion to Decertify Plaintiff's Rule 23 FDUPTA Class (Doc. 145), Plaintiff's response (Doc. 147), and Defendants' reply (Doc. 150). For the following reasons, the Court grants Defendants' motion for summary judgment, denies Plaintiff's motion for summary judgment, and denies Defendants' motion to decertify as moot.

**Material Facts**

This case involves claims under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, et seq., and the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.204. NCH operates two hospitals in Florida. (Doc. 146-2). Nurses who apply to a specialty department at NCH with less than one year of experience must join NCH's Specialty Fellowship Program ("Fellowship Program"). (Doc. 94-6). The Emergency Department, Mom and Baby Department, Labor and Delivery Department, and Intensive Care Unit Department participate in the Fellowship Program. (Doc. 146-6).

According to Defendants, nurses who participate in the Fellowship Program receive 12 to 20 weeks of free specialized training to ensure that newer nurses can provide the same quality of care as experienced nurses in these specialized areas of the hospitals. (Doc. 146-4). Plaintiff disputes that the program is free, pointing out that participants must sign an agreement that requires them to stay employed with NCH for two years or pay NCH $5,000. (Doc. 94-9). She also disagrees that the training is specialized. Rather, she states that NCH offers all nurses the same training and that the training is typical of other healthcare facilities. (Doc. 167 at 2 ¶ 4).

As part of the Fellowship Program, nurses receive specialty-specific training that includes regular classroom-based instruction, online educational coursework, simulation-based training, and supervised clinical experience.

Fellowship participants attend scheduled classroom sessions and complete online education tailored to the specialty department in which they are training.  In addition, nurses participate in simulation training, where they practice using department-specific equipment and supplies and work through clinical scenarios outside of a patient-care setting.  Fellowship participants also receive hands-on training during clinical shifts as situations arise, with support and guidance from preceptors and other experienced staff.  (Docs. 145-2–145-6).

During the Fellowship Program, Defendants pay the nurses their full specialty nurse hourly rate for each hour they train—resulting in the nurses being paid around $1,500 per week during training.  (Doc. 164 at 3 ¶ 6).  Nurses in the Fellowship Program provide care that a preceptor oversees until the nurses have completed the Fellowship Program and a clinical educator clears them for work.  (Doc. 164 at 3 ¶ 7).

To participate in the Fellowship Program, NCH requires each nurse to sign the Specialty Fellowship Program Employment Agreement ("Fellowship Agreement").  (Doc. 164 at 3 ¶ 9).  In exchange for providing the training for free, the nurse agrees to work for NCH for two years after completing the Fellowship Program.  If a nurse breaches the Fellowship Agreement, then he or she agrees to pay NCH a $5,000 fee.  The provision states:

> I understand and agree that in consideration of the training I will receive, I will be required to maintain regular full-time status in good standing within the [relevant department] for a period of two (2) years following my start date in the Fellowship Program unless catastrophic circumstances prevent this as approved by the CNO or Chief of Human Resources. In the event I do not fulfill my obligation under the Fellowship Program, thru no fault of NCH, I will be responsible to pay back the program fee of $5,000. This fee will not be prorated based on time in the program. In the event of catastrophic circumstances which may prevent fulfillment of the agreement payback options will be reviewed and approved by the CNO or Chief of Human Resources on an individual basis.

(Doc. 164 at 4 ¶ 11).  NCH informs nurses both orally and in writing that there is a $5,000 program fee they would be responsible for if they do not fulfill the two-year contractual obligation under the Fellowship Agreement.  (Doc. 164 at 4 ¶ 12).  According to Defendants, the program fee is not represented to any nurse as being indicative of the value and/or worth of the Fellowship Program. (Doc. 164 at 4 ¶ 13).  Every deposed class member voluntarily chose to participate in the Fellowship Program and confirmed they were aware of the $5,000 repayment obligation.  By contrast, Plaintiff states that deposed class members "expressed the belief that the $5,000 program fee was meant to cover the cost of the training and confusion about the fee's purpose."  (Doc. 167 at 4 ¶ 14).  There is no dispute that the purpose of the program fee is to incentivize nurses to stay at least two years following their completion of the Fellowship Program.

During the Fellowship Program, Defendants compensate program participants at their regular hourly rate. (Doc. 164 at 5 ¶ 16). If a nurse participating in the Fellowship Program leaves NCH before completing their two years and does not pay back the entirety of the fee voluntarily, NCH deducts a portion of the program fee from the nurses' final paycheck and withholds any accrued paid time off ("PTO") but ensures that the nurse still receives at least minimum wage in that paycheck. (Doc. 164 at 6 ¶ 18). Plaintiff disputes that Defendants pay the minimum wage, pointing to Plaintiff having her wages reduced below the minimum wage. (Doc. 167at 4 ¶ 18).

If a nurse does not voluntarily repay the fee and the amount recovered from the last paycheck and accrued PTO still leaves a balance on the $5,000 program fee, NCH sends the nurse an employment compensation repayment letter. (Doc. 94-15.) The letters are the initial repayment demand issued to nurses who failed to meet the two-year contractual obligation of the Fellowship Agreement. Nurses then have 30 days after receiving the letter to pay NCH the remaining balance of the program fee. If a nurse does not pay NCH within those 30 days, NCH forwards the balance to a debt collector to collect the remaining balance.

Plaintiff is a registered nurse who accepted a position in NCH's Emergency Department in May 2021. Plaintiff had less than one year of experience as a nurse in the Emergency Department and, therefore, for

5

Plaintiff to safely work in the Emergency Department, NCH required Plaintiff to join the Fellowship Program and sign the Fellowship Agreement. Plaintiff disputes whether Defendants disclosed safety as a basis for participation in the program. During her time in the Fellowship Program, Plaintiff received online learning, classroom didactic, skills validation, and clinical practice with an experienced preceptor.

Plaintiff understood and accepted the terms of the Fellowship Agreement. In her view, the program fee was meant to cover the value of the program. (Doc. 167 at 5 ¶ 27).

After eleven months of working for NCH, Plaintiff resigned. In her resignation email, Plaintiff stated: "I regret to inform you of my resignation from full time RN in the emergency department, due to an emergency family circumstance requiring my relocation to another state." (Doc. 145-6). After Plaintiff's resignation and breach of the Fellowship Agreement, NCH deducted $477.90 from her final paycheck and withheld $897.91 of accrued PTO. After the deduction, Plaintiff received $1,844 for 62 hours of work in her final paycheck. The remaining balance of $3,624.19, which Plaintiff failed to pay, was sent to a debt collector.

**Procedural History**

Plaintiff filed this lawsuit in July 2023. (Doc. 1). After much motion practice, including an order dismissing at least one claim with prejudice (Doc.

49), she filed the Second Amended Complaint (Doc. 84), the operative pleading.[1] She brings the following claims: FLSA – illegal kickback and failure to pay minimum wage, 29 U.S.C. § 216 (count 1); FLSA – failure to pay minimum wage free and clear, 29 U.S.C. § 216 (count 2); FDUTPA, Fla. Stat. § 501.204 (count 3); and Florida Declaratory Judgment Statute, Fla. Stat. § 86.011 (count 4). Defendants answered. (Doc. 92).

The Court conditionally certified a collective defined as: "Individuals who (1) were employed by Defendants within the three years preceding the date notice is sent; (2) participated in Defendants' Specialty Fellowship Program; and (3) were subject to the Specialty Fellowship Program Employment Agreement." (Doc. 64). "Additionally, the Court certified a class under FDUTPA of "[a]ll nurses who are or were subject to NCH's Specialty Fellowship Program Employment Agreement and the training repayment provisions therein at any point from July 31, 2019, through" the date of certification. (Doc. 122).

In February 2026, the Court decertified the collective action. (Doc. 165). Both parties moved for summary judgment, and Defendants moved to decertify the Rule 23 FDUTPA class. (Docs. 145, 146, 164).

---

[1] Incidentally, the Second Amended Complaint is a shotgun pleading, where Plaintiff "realleges and incorporates by reference the foregoing allegations" in Counts 2–4. (Doc. 84 ¶¶ 138, 147, 166). But Defendants answered the pleading, so the Court discusses this matter no further.

**Legal Standard**

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When deciding a motion for summary judgment, a judge "is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

"An issue is genuine if a reasonable [factfinder] could return a verdict for the nonmoving party." *Do v. Geico Gen. Ins. Co.*, No. 1:17-CV-23041-JLK, 2019 WL 331295, at *2 (S.D. Fla. Jan. 25, 2019). And a "fact is material if it may affect the outcome of the case under the applicable substantive law." *Id.*

"The moving party bears the initial burden of identifying those portions of the record demonstrating the lack of a genuinely disputed issue of material fact." *Desai v. Navigators Ins. Co.*, 400 F. Supp. 3d 1280, 1287 (M.D. Fla. 2019). "If the movant does so, the burden then shifts to the non-moving party to demonstrate that there are, in fact, genuine factual disputes which preclude judgment as a matter of law." *Id.* "The assertion that a fact is genuinely disputed . . . must [be] supported by particular parts of materials in the record." *Moore v. Eger*, No. 616CV303ORL28GJK, 2017 WL 6367598, at *2 (M.D. Fla. Oct. 20, 2017). "In ruling on a motion for summary judgment, the Court

8

construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party." *Id.* at *3.

## Analysis

### A.    FDUTPA

"To sustain a FDUTPA claim, a plaintiff must show (1) a deceptive act or unfair trade practice; (2) causation; and (3) actual damages."[2] *Casa Dimitri Corp. v. Invicta Watch Co. of Am., Inc.*, 270 F. Supp. 3d 1340, 1351 (S.D. Fla. 2017) (citing *Dolphin LLC v. WCI Cmtys., Inc.*, 715 F.3d 1243, 1250 (11th Cir. 2013) (internal quotation marks omitted)).

Defendants argue Plaintiff cannot point to any evidence supporting the existence of a deceptive or unfair practice under FDUTPA; thus, they are entitled to summary judgment on both of Plaintiff's theories: (1) that Defendants made a deceptive misrepresentation regarding the value of the Fellowship Program, and (2) that requiring repayment of $5,000 upon breach of the Fellowship Agreement constitutes unfair conduct. (Doc. 164 at 12). For these reasons, the Court agrees.

### 1. Deceptive

A deceptive act occurs when a defendant makes "a representation, omission, or practice that is likely to mislead the consumer acting reasonably

---

[2] The parties' arguments and evidence regarding what is a "deceptive act" and/or an "unfair trade practice" overlap somewhat.  Still, the Court finds that Plaintiff has failed to meet her burden on both concepts.

in the circumstances, to the consumer's detriment." *Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cnty., Inc.*, 169 So. 3d 164, 169 (Fla. Dist. Ct. App. 2015) (citing *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003)) (emphasis omitted).  An objective test is used to determine whether an act is deceptive under FDUTPA, and "the plaintiff must show that the alleged practice was likely to deceive a consumer acting reasonably in the same circumstances." *Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1098 (11th Cir. 2021) (internal quotation marks omitted).

According to Plaintiff, "[b]y not stating the true purpose of the $5,000 fee and describing it as a 'program fee' that would need to be repaid, NCH misled its nurses."  (Doc. 167 at 9).  In other words, Defendants misrepresented the purpose of the fee and the value of the training provided through the Fellowship Program.  But the undisputed evidence shows this is not so.

There is the Fellowship Agreement itself.  The plain language of the Fellowship Agreement does not state that the Program is *worth* $5,000.  (Doc. 145-1 (signed Fellowship Agreements)); *cf. Zlotnick v. Premier Sales Grp., Inc.*, 480 F.3d 1281, 1284 (11th Cir. 2007) (affirming dismissal of plaintiff's complaint for failure to state a claim where the "express terms of the reservation agreement undermine[d]" the claim).  Rather, it explicitly provides: "In the event I do not fulfill my obligation under the Fellowship Program, thru no fault of NCH, I will be responsible to pay back the program

10

fee of $5,000. This fee will not be prorated based on time in the program." (*Id.* at 2). If a nurse who signs a Fellowship Agreement leaves before two years are up, she must pay NCH $5,000. As Defendants point out, the Fellowship Agreement identifies $5,000 as the amount owed in the event of a breach. (Doc. 164 at 12). It does not tie that amount to the value of training. (*Id.*).

Consistent with that reading, Jennifer Hart, director of talent management in NCH's human resources department and Defendants' corporate representative, testified that the $5,000 is

> a general calculation of recouping of fees. It's certainly not the true value of the money that it takes to run the program and keep people employed in the program, training and the hours and material, but it is a small amount should someone leave the program early and go to another employer, for example, before those two years. So my understanding it was an amount that was considered reasonable should someone leave—leave prematurely.

(Doc. 146-2 at 3, 6). And she explained that the program fee was "supposed to be considered binding in the case that if someone had to leave for whatever reasons, we would want to mark up all our costs." (*Id.* at 6). The fee "was meant to invest in [nurses'] education and ability to do a specialty for patient care, so . . . the amount was really just for anything to incentivize people to stay." (*Id.*). In other words, the fee prohibits employees from receiving the benefit of free training to become highly skilled nurses at Defendants' expense and then leaving to provide those newly acquired skills to a competitor. (Doc. 164 at 12).

To salvage the first element of her FDUTPA claim, Plaintiff labels the fee a "trap." (Doc. 167 at 10). She characterizes Defendants' wish to keep nurses employed at NCH for at least two years as "deceptive conduct," and she seems to believe she has unveiled a smoking gun. (*Id.*). But Defendants are not hiding the ball. They freely admit the purpose of the fee. They did not represent otherwise in the Fellowship Agreement or on their website.[3] So Plaintiff's argument on this point falls flat.

Further, class members' undisputed testimony supports this conclusion. No class member, including Plaintiff, testified that Defendants told them that the training was worth $5,000.

Nicholle Oquendo testified:

> Q. And then what was your understanding of the $5,000 associated with the fellowship in the ICU?
>
> A. My understanding with the $5,000 was to – to basically incite someone to finish the contract, so they didn't receive the training and then just leave before the contract ended.

(Doc. 145-2 at 8).

---

[3] Plaintiff points out that Defendants market the program on their website. (Doc. 167 at 8 (citing Doc. 146-2 (Hart Dep. 65:18–66:17, 67:15–19))). This is true, but Hart's testimony does not show that Defendants advertised the value of the program was $5,000, engaged in other deceptive conduct, or made misrepresentations. In their Answer, Defendants admit "that their webpage states 'START YOUR NURSING CAREER TODAY', that it provides contact information to learn more about "NCH Nursing Careers", and that it provides a link that says 'APPLY TODAY'. Defendants admit that this webpage is viewable by the public. Defendants deny that they advertise the fellowship program to the public, as a prerequisite for signing up for the fellowship program is already being a licensed nurse." (Doc. 92 at 7 ¶ 47).

Jimi Williamceau testified:

> Q. Okay. So, at no point did you understand the $5,000 to be the amount intended to cover the costs of the training you were going to receive?
>
> . . .
>
> A. That's—I believe that's—that's correct.
>
> . . .
>
> Q. Okay. And in that phone call did anybody represent to you that the $5,000 would be prorated based on the time that you worked?
>
> A. I don't recall. I don't—I don't think that was mentioned in the phone call.

(Doc. 145-5 at 7).

McFalls testified:

> Q. Well, other than indicating to you that you would repay $5,000 if you left within two years after your fellowship started, did NCH mention anything about the monetary cost of the fellowship?
>
> A. Other than the $5,000?
>
> Q. Yes, ma'am.
>
> A. No.

(Doc. 145-6 at 40).

Stephanie Kumetz testified:

> Q. Yes. Did you understand that the $5,000 was intended to cover the costs of all the training you received during the fellowship program?
>
> A. No.

13

> Q. What did you understand the $5,000 to be?
>
> A. A penalty fee, essentially.

(Doc. 145-11 at 9).

Similarly, nurses testified that they understood the $5,000 repayment obligation when they signed the Fellowship Agreement. Specifically, McFalls testified that she understood that she was agreeing that in consideration of the training she would receive that she would be required to maintain regular, full-time status for a period of two years following her start date of the Fellowship Program. (Doc. 145-6 at 10). Moreover, she testified that she understood the contract term requiring her to repay the program fee of $5,000. (*Id.*). She also testified that she understood the term explaining that the fee would not be prorated based on time in the program. (*Id.*).

Another nurse, Sandra Camejo, testified that she "understood that if [she] left any time before the two years, [she] was going to have to pay the money back." (Doc. 145-9 at 12). In Camejo's view, "you sign a contract with the understanding that that's required. . . . And then if you . . . asked me if I think it's fair to pay just because of the fellowship, I would say yes, I think it is. I think it's worth it." (*Id.*).

Madison Hitchcock testified that before signing the contract, she understood that if she did not stay for two years after the beginning of the

fellowship that she would have to repay a $5,000 program fee. (Doc. 145-7 at 7).

Additionally, Kumetz testified that she understood that if she stayed employed with NCH for two years after she began her fellowship that she would not have to pay any money for the training she received. (Doc. 145-11 at 8).

Plaintiff provides no evidence to the contrary. Instead, she attempts to argue that Defendants' use of the phrase "program fee" "implies that the $5,000 represents the cost or value of the program." (Doc. 167 at 9). And she argues that the terms "pay back," "payback options," "repayment," and "reimbursement" "incorrectly imply that nurses owe NCH for a good or service." (Doc. 167 at 9 (citing Doc. 94-9 (Fellowship Agreement), Doc. 94-15 (collections letter))). But these arguments are merely Plaintiff's subjective beliefs about the purpose of the Fellowship Agreement and the purported value of the training. She points to no assertion or representation Defendants made that $5,000 was the value of the program. As such, her assertion that she "must only establish an objective reliance on the TRAP's stated value of the program" misses the point. (Doc. 167 at 10 (citing *Fitzpatrick v. Gen. Mills, Inc.*, 635 F.3d 1279, 1283 (11th Cir. 2011) ("[A] plaintiff need not prove reliance on the allegedly false statement to recover damages under FDUTPA, but rather a plaintiff must simply prove that an objective reasonable person would

15

have been deceived.")).  She fails to identify evidence that Defendants ever stated that the value of the program was $5,000.  In other words, there is no false statement on which an objective reasonable person could have relied.

She also argues that her FDUTPA claim "is based in the 'net impression' NCH's conduct would have on a reasonable person."  (Doc. 167 at 10).  But to the extent Plaintiff relies on case law regarding "net impression," her argument lacks merit.  "In determining whether a representation is likely to mislead consumers acting reasonably, courts consider the net impression created." *Coleman v. CubeSmart*, 328 F. Supp. 3d 1349, 1361 (S.D. Fla. 2018) (citing *F.T.C. v. RCA Credit Servs., LLC*, 727 F. Supp. 2d 1320, 1329 (M.D. Fla. 2010)); *see also Fruitstone v. Spartan Race Inc.*, 464 F. Supp. 3d 1268, 1287 (S.D. Fla. 2020) ("Plaintiff maintains that whether a reasonable consumer would interpret [the fee] as a 'pass-through charge' is a jury question . . . and that the 'net impression' created by Defendant's alleged representations and omissions supports the view that a reasonable consumer would be deceived") (citation omitted).

Plaintiff's invocation of the phrase "net impression" does not create a triable issue.  First, two procedural points.  As Defendants point out, *Fruitstone*—and *Coleman*, for that matter—involved a motion to dismiss, while this case is before the Court on motions for summary judgment.  (Doc. 169 at

16

2). And, even if they were persuasive—which they are not—as district court opinions, they are not binding on this Court.

Now, the substance. Defendants emphasize that "like all of the other cases involving FDUPTA claims for fees, the issue arises when a fee either does not provide accurate information on where the money is going or fails to disclose all of the fee in general." (*Id.* (citing *Fruitstone*, 464 F. Supp. 3d at 1288)). As the evidence cited above demonstrates, the nurses participating in the Fellowship Program were aware of the fee, understood the terms of repayment, knew NCH would receive any repaid funds, and understood what the training would entail. The Court agrees with Defendants—and the evidence supports—that any "net impression" Defendants provided Plaintiff was that the nurses would receive training and would have to pay a $5,000 fee if they breached the Fellowship Agreement.

The standard requires a showing of "probable, not possible, deception." *Zlotnick*, 480 F.3d at 1284; *Maor v. Dollar Thrifty Auto. Grp, Inc.*, No. 15-22959-CIV, 2018 WL 4698512, at *6 (S.D. Fla. Sept. 30, 2018). An objectively reasonable consumer would not be deceived by the term "program fee" as used in the Fellowship Agreement. In fact, the evidence not only shows that any reasonable person would not be deceived—but that the NCH nurses were in fact not deceived. In short, the undisputed evidence establishes that the "net

impression" is that a reasonable consumer would not be deceived by the Fellowship Agreement or use of the phrase program fee.

### 2. Unfair

A practice is unfair under the FDUTPA if it "offends established public policy" or is "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *PNR*, 842 So. 2d at 777. Plaintiff has failed to demonstrate that a genuine issue of material fact exists on this issue.

She argues that Defendants' practice of offering all components of the program training to non-program nurses at no cost is unfair because: "(1) each Class Member was led to believe that they would receive particularized training and that the training had a per-person $5,000 value (*see* SOF ¶ 4) when, in reality, (2) NCH actually uses misrepresentations to impose the $5,000 on Class Members for training that it offers non-program nurses free of charge."[4]  (Doc. 146 at 16).  Because all nurses have access to the program materials, Plaintiff argues that "any costs should be shared across the entire nurse population at NCH instead of forcing program nurses to subsidize non-program nurses' use of program materials." (Doc. 167 at 11).

Again, Plaintiff's argument fails. Simply because it does not make "mathematical sense" to her or merely because she believes costs should be

---

[4] This convoluted and circular argument substantially overlaps with Plaintiff's arguments that Defendants' conduct is "deceptive" under FDUTPA.  The Court's reasoning concerning the non-deceptive nature of the conduct above applies to this section as well.

shared does not make Defendants' business practice "unfair" as a matter of law under FDUTPA. (*Id.*). Rather, as already stated, it must be "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *PNR*, 842 So. 2d at 777. The evidence does not bear this out.

The undisputed facts show that Defendants paid Plaintiff and class members more than $10,000 in wages to participate in a 12-to-20-week training program that included regular classroom-based instruction, online educational coursework, simulation-based training, and supervised clinical experience. (Doc. 164 at 2 ¶ 5). The program provided inexperienced nurses an opportunity to work in a specialty area of the hospital and receive a higher hourly rate of pay. (Doc. 164 at 2–3 ¶¶ 3–6). If a participant voluntarily left employment within two years after completing the Fellowship Program, they owed a $5,000 fee; otherwise, Defendants provided the training at no cost.

Defendants have it right—Plaintiff's argument is "based entirely on her subjective disagreement with her perceived value of the training." (Doc. 164 at 14). But simply because nurses who were not Fellowship Program participants were permitted to sit in on lectures, access online materials, or use the simulation lab without charge does not render the program's value $0. Moreover, Defendants underscore that they did not pay experienced nurses to attend the trainings, while they paid Fellowship Program participants their full hourly rate throughout the training period. (Doc. 152 at 16 (citing Doc.

19

145-12)).  Plaintiff has not shown that it was "immoral," "unethical," etc. to allow experienced nurses to participate in such activities without requiring them to sign a Fellowship Agreement.

Defendants provide an instructive hypothetical for comparison.  "A law student could assert a FDUPTA [*sic*] claim for being charged tuition merely because an alumnus—already familiar with the material—was permitted to attend the course as a refresher.  But how would that impact the value that the law student received from the class?"  (*Id.* at 16).  It would not.

As Defendants point out, "Plaintiff provides no statistical evidence, no class member testimony, and no expert testimony or other competent evidence that concludes or even suggests that the objective value of the training program is less than $5,000." (Doc. 164 at 16).  That the repayment provision incentivized nurses to remain employed for two years does not negate the program's value.

By contrast, Defendants identify evidence that the Fellowship Program costs them more than $5,000 per nurse in wages alone, in addition to the specialty training software, additional compensation for preceptors, the educators' salaries, and textbooks and manual. (Doc. 164 at 5–6 ¶¶ 16–17 (explaining that during the Fellowship Program, NCH compensates Fellowship participants at their regular hourly rate); Doc. 94-18 (NCH's Resp

20

to Interrog. No. 2)[5]; Doc. 145-10 (payroll records show Plaintiff and class members were paid more than $10,000 to participate in the training))).

Plaintiff offers no evidence to contradict the objective value of the program. Instead, she falls back on general references to case law and her net impression arguments. (Doc. 167 at 10–11). In short, Plaintiff has failed to meet her burden to show that a genuine issue of material fact exists as to whether Defendants engaged in a deceptive omission or representation or an unfair practice that is objectively offensive to public policy or immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.[6]

---

Defendants describe their costs in operating the Fellowship Program as follows:

> Defendant incurs direct costs in the form of: (1) an annual contract with Elsevier for an online Performance Management Software that provides the training modules for each participant in the fellowship program; (2) additional hourly compensation provided to preceptors that work with and train each participant in the fellowship program; (3) the salary of an educator that provides classroom training each week; and (4) a TNCC manual that each participant in the program is provided. Defendant also incurs additional costs related to providing in-person training to each participant.

> The $5,000 amount was determined when the fellowship program was created and was intended to approximate the out-of-pocket costs that were incurred. However, Defendant did not calculate the exact amount spent per employee nor did it vary the amount based on the number of employees participating in the program in each year. Further, Defendant has not increased the amount since the program's inception for things like inflation, increased wages, etc.

(Doc. 94-18 at 5).

[6] Because Plaintiff fails to meet her burden on the first element of her FDUTPA claim, the Court need not address the second and third elements concerning causation and damages.

21

Accordingly, the Court grants summary judgment in Defendants' favor on Plaintiff's FDUTPA claim (count 3).

**B.    FLSA**

The FLSA requires employers to pay at least the federal minimum wage to each employee "engaged in commerce." 29 U.S.C. § 206(a)(1). An employer has not satisfied the minimum wage requirement unless the compensation is "free and clear," meaning the employee has not kicked back part of the compensation to the employer. 29 C.F.R. § 531.35. Thus, employers generally may not issue paychecks at the minimum wage rate and then require employees to give some of the money back. *Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892, 897 (9th Cir. 2013). "If an expense is determined to be primarily for the benefit of the employer, the employer must reimburse the employee during the workweek in which the expense arose." *Arriaga v. Fla. Pac. Farms, L.L.C.*, 305 F.3d 1228, 1237 (11th Cir. 2002) (citing 29 C.F.R. § 531.35).

Before analyzing the parties' arguments concerning Plaintiff's FLSA claims, the Court must clarify the legal framework. Plaintiff brings two FLSA claims: FLSA – illegal kickback and failure to pay minimum wage, 29 U.S.C. § 216 (count 1); and FLSA – failure to pay minimum wage free and clear, 29

---

And for the reasons stated in Defendants' motion for summary judgment, the Court agrees that Plaintiff failed to meet her burden on those elements as well.

U.S.C. § 216 (count 2).    (Doc. 84 ¶¶ 130–46).    Plaintiff's FLSA claims undisputedly relate to 29 C.F.R. § 531.35, which provides:

> Whether in cash or in facilities, "wages" cannot be considered to have been paid by the employer and received by the employee unless they are paid finally and unconditionally or "free and clear."    The wage requirements of the Act will not be met where the employee "kicks-back" directly or indirectly to the employer or to another person for the employer's benefit the whole or part of the wage delivered to the employee.  This is true whether the "kick-back" is made in cash or in other than cash.

In their motion, Defendants explain that Plaintiff's distinction between an illegal kickback violation and a "free and clear" violation is one without a difference.  (Doc. 164 at 22).  The statute does not mention an anti-kickback or free and clear obligation; rather, it requires an employer to pay its employees minimum wage in each workweek.  (*Id.* (citing 29 U.S.C. § 206(a)).  Essentially, Defendants appear to argue that Plaintiff should have pled one minimum wage violation claim, rather than separate "illegal kickback" and "free and clear" violation claims.

The case law supports Defendants' position that the statute does not provide an independent cause of action for kickbacks.  "Kickbacks are not *per se* illegal, but only when they reduce the wage below the minimum or overtime wages required by the FLSA."  *Cudnik v. W.L. York, Inc.*, No. CV H-20-2998, 2021 WL 3674972, at *3 (S.D. Tex. Feb. 5, 2021) (granting motion to dismiss to the extent kickbacks are pleaded as an independent cause of action) (citing 29

23

C.F.R. § 531.35). "Employee repayment and reimbursement provisions do not violate the FLSA provided the employee's effective wages remain above the minimum wage level." *Franks v. MKM Oil, Inc.*, No. 10 C 13, 2010 WL 3613983, at *4 (N.D. Ill. Sept. 8, 2010) (citing *Heder v. City of Two Rivers, Wisc.*, 295 F.3d 777, 782 (7th Cir. 2002)). Moreover, in her response, Plaintiff does not dispute Defendants' contention that her two claims should have been pled as one. (*See generally* Doc. 167). No matter how they are pled, Plaintiff's FLSA claim(s) fail for the reasons below.

Under the FLSA, expenses cannot be shifted to employees when they are "for the employer's benefit." *Villarino v. Pacesetter Pers. Serv., Inc.*, 2025 WL 3492915, at *5–6 (11th Cir. Dec. 5, 2025). Here, the parties dispute whether the training was for the benefit of Defendants, and accordingly, whether there was a kickback of wages. (Doc. 164 at 24–27; Doc. 167 at 15–16). But the Court need not decide this issue because even if Defendants' collection of the program fee constitutes an illegal kickback, Plaintiff's FLSA claims still fail as a matter of law because she received at least minimum wage in each week she worked.

Plaintiff's final pay stub reflects that Defendants deducted $477.90 from her final paycheck to pay a portion of the program fee.[7] (Doc. 55-1 at 2). This deduction left her with $1,844 in current earnings in her final pay period for

---

[7] In Plaintiff's motion for summary judgment, she calculates the wages paid for all Collective Members. (Doc. 146 at 22). Because the Court decertified the collective action after she filed her motion, it only analyzes wages paid to Plaintiff. (Doc. 165).

62 hours of work; in other words, Defendants paid Plaintiff $29.74 per hour during her last pay period, well above the federal minimum wage. *See* 29 U.S.C. § 206(a)(1)(C) (establishing $7.25 as the federal minimum wage).

But Plaintiff views her final workweek wages differently. She calculates that she worked 29.75 hours and received $1,160.95 in wages in her final workweek. (Doc. 146 at 11 ¶¶ 51, 52; *id.* at 22).[8] In her view, the $477.90 program fee deduction should all be credited against her final workweek. And she states that Defendants refused to pay $897.91 of accrued PTO.[9] (*Id.* ¶ 52). Added together, Defendants deducted $1,375.81, meaning she received negative $214.86 in wages in her final workweek. Defendants sent the balance of $3,624.19 to a debt collector.[10] (*Id.*). In sum, for Plaintiff's calculations to pass muster, the Court would have to agree with her that (1) the total amount deducted for the program fee and PTO could be assigned to the last paycheck,

---

[8] For support, Plaintiff cites "Exhibit G: McFalls Hours," which is a 15-page spreadsheet of what appears to be her schedule at NCH from May 24, 2021, through April 20, 2022. (Doc. 146 at 11 ¶ 51 (citing Doc. 146-8)). It contains information concerning her schedule, pay code, amount, shift, and period. Unhelpfully, she does not pinpoint a page number or otherwise attempt to explain to the Court where in this 15-page exhibit she extracted this information. Such practice does nothing to aid the Court in understanding her argument or analyzing the evidence she argues supports it.

[9] Plaintiff cites her Second Amended Complaint for this proposition. (Doc. 146 at 11 ¶ 52 (citing Doc. 84 ¶¶ 107–11)). Defendants admit this fact. (Doc. 152 at 10 ¶ 52). The Court is troubled by Plaintiff's citation to an allegation in the complaint that lacks a corresponding citation to evidence. But because Defendants admit the fact, the Court discusses this issue no further.

[10] The $5,000 program fee charged to Plaintiff is calculated as follows: $477.90 (program fee) + $897.91 (accrued PTO) + $3,624.19 (balance of debt) = $5,000 (program fee).

and (2) that seizing PTO creates a minimum wage violation.[11]   For these reasons, the Court does not.

First, the legal authority Plaintiff cites does not support the idea that she can assign the total amount deducted to the last paycheck.  In her motion and response, she relies on *Rivera*, 735 F.3d at 897, and *Arriaga*, 305 F.3d at 1237.  (Doc. 146 at 22; Doc. 167 at 19).  But the Court cannot see how *Rivera* supports her position, and regardless, as a Ninth Circuit opinion, it is not binding on this Court.  And she quotes *Arriaga* for the proposition that "[c]ompliance with the FLSA is measured by the workweek," but that statement does not give her carte blanche to shoehorn the total amount deducted into her final paycheck to prove a minimum wage claim.

By contrast, Defendants rely on *Fuchs v. Specialtycare, Inc.*, No. 3:23-CV-00892, 2025 WL 2382931, at *6 (M.D. Tenn. Aug. 15, 2025), a highly persuasive Middle District of Tennessee case that rejects Plaintiff's approach (albeit in a motion to dismiss posture).  (Doc. 164 at 29).  In *Fuchs*, the court found that a plaintiff "cannot selectively deduct the $15,000 from his final paycheck rather than prorate this amount to account for all the paychecks that [the plaintiff] received." *Fuchs*, 2025 WL 2382931, at *6.  Here, the Court

---

[11] To be fair, the parties raise other arguments related to the FLSA claims.  But the Court need not discuss them all.  It has reviewed the briefs and concludes that Plaintiff has not shown a genuine issue of material fact exists such that her FLSA claim(s) survive summary judgment.

similarly concludes that Plaintiff "does not get to assign the totality of the debt she [owes] to [her] last paycheck to create a minimum wage violation. Instead, the amount would be spread out over the period in which the debt was incurred." (Doc. 164 at 29 (citing cases)).

Second, to bring her case across the finish line, Plaintiff admits that she "disagrees" with the Court's finding that PTO is not treated as wages under the FLSA.[12] (Doc. 167 at 17). To be clear, she argues that "though [she] agrees with the Court that PTO are not wages, [she] does not argue that they are." (*Id.*). Rather, she frames the issue differently. In Plaintiff's view, whether something is a "wage" is a different question than whether something is an unlawful deduction or kickback. (*Id.* (citing *Frenel v. Freezeland Orchard Co.*, No. CIV.A.87-278-A, 1988 WL 58061, at *4 (E.D. Va. Apr. 8, 1988) (analyzing the two issues separately))). She analyzes this point no further.

In any event, the Court finds that Defendants have the better argument. They point out that while not all wages are kickbacks, all kickbacks must consist of wages. (Doc. 169 at 5). Under the FLSA, only wages can be "kicked

---

[12] In decertifying the FLSA collective action, the Court wrote: "Plaintiff uses PTO totaling $897.91 that Defendants credited toward her program fee in alleging an FLSA violation. The PTO amount is irrelevant because it is not treated as wages under the FLSA. *See Foster v. JHM Enters., Inc.*, No. 510CV405OC99TJCMCR, 2011 WL 13295747, at *3 (M.D. Fla. Jan. 21, 2011), *report and recommendation adopted*, 2011 WL 13295748 (Mar. 10, 2011) (noting "the FLSA does not consider vacation pay to be wages") (citation omitted); *see also Higgins v. Bayada Home Health Care Inc.*, 62 F.4th 755, 756–758 (3d Cir. 2023) (holding PTO deductions do not violate FLSA)." (Doc. 165 at 5 n.4).

back" in violation of the law. (*Id.* (citing 29 C.F.R. § 531.35 ("Whether in cash or in facilities, 'wages' cannot be considered to have been paid by the employer . . . . The wage requirements of the Act will not be met where the employee 'kicks-back' directly or indirectly to the employer or to another person for the employer's benefit the whole or part of the wage delivered to the employee."))). Thus, if something is not a wage, *i.e.* PTO, it cannot be kicked back in violation of the FLSA. Because Plaintiff has not met her burden to demonstrate that she was paid less than the federal minimum wage in a workweek, her FLSA minimum wage claim(s) fail.

## C. Declaratory Judgment

Neither party discusses count 4, Plaintiff's Florida declaratory judgment claim, in which she seeks a declaration that the $5,000 repayment provision of the Fellowship Agreement is unlawful and unenforceable, among other things. (Doc. 84 at 29). But given the Court granted summary judgment in Defendants' favor on the FDUTPA and FLSA counts, and no actual controversy remains, the Court finds that the declaratory judgment claim is moot.

Accordingly, it is now:

**ORDERED:**

1. Defendants NCH Healthcare System, Inc. and Naples Community Hospital, Inc.'s Motion for Summary Judgment (Doc. 164) is **GRANTED**.

2.     Plaintiff Lauren McFalls' Motion for Summary Judgment (Doc. 146) is **DENIED**.

3.     Defendants' Motion to Decertify Plaintiff's Rule 23 FDUPTA Class (Doc. 145) is **DENIED AS MOOT**.

4.     The Clerk is **DIRECTED** to enter judgment in favor of Defendants and against Plaintiff, terminate all pending motions or deadlines, and close the file.

**DONE and ORDERED** in Fort Myers, Florida on May 28, 2026.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies: All Parties of Record

29